FILED

2025 Mar-06  PM 03:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GILBERTO VAZQUEZ GOMEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:20-cv-8012-MHH** |
| **UNITED STATES OF AMERICA,** | ) | **2:17-cr-403-MHH-SGC** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Gilberto Vazquez Gomez has asked the Court to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255. (Doc. 1).[1] Mr. Gomez contends that his attorney was ineffective. By separate order, the Court has rejected two of Mr. Gomez's three ineffective assistance of counsel arguments, one concerning his attorney's failure to object to the chapter four pattern of activity enhancement in Mr.

---

[1] The Court regards Mr. Gomez's § 2255 motion as filed on April 23, 2020 within one year of his final conviction. 28 U.S.C. § 2255(f)(1). The Clerk of Court docketed the motion on April 27, 2020, but Mr. Gomez signed the motion on April 23, 2020, (Doc. 1, p. 12). Therefore, by operation of the "prison mailbox" rule, the Court deems the motion filed on April 23, 2020. *See Houston v. Lack*, 487 U.S. 266, 271-72 (1988) (holding a *pro se* prisoner's submission is deemed filed on the date it is delivered to prison authorities for mailing).

"Doc." record cites refer to docket entries in this habeas case No. 2:20-cv-8012-MHH; "Crim. Doc." record cites refer to docket entries in Mr. Gomez's underlying criminal case, No. 2:17-cr-00403-MHH-SGC-1.

Gomez's presentence report and one concerning Mr. Gomez's assertion that his plea was involuntary because his attorney coerced him "to plead to that of which he [was] innocent." (Doc. 5). The Court held an evidentiary hearing on Mr. Gomez's remaining argument that his attorney was ineffective because he did not file an appeal as instructed. (Doc. 39).[2]

This opinion addresses Mr. Gomez's remaining ineffective assistance of counsel theory. The Court first identifies the general rule that governs assertions of ineffective assistance of counsel. Then, the Court discusses the proceedings in Mr. Gomez's criminal case and the testimony from the § 2255 evidentiary hearing in this case. Finally, the Court evaluates Mr. Gomez's ineffective assistance of counsel argument under the applicable legal standards.

---

[2] Judge Abdul Kallon presided over Mr. Gomez's criminal case and initially addressed Mr. Gomez's § 2255 motion. Judge Kallon set an evidentiary hearing regarding Mr. Gomez's contention that his attorney did not file an appeal as instructed. (Docs. 5, 16). The magistrate judge from Mr. Gomez's criminal case appointed an attorney to represent Mr. Gomez during the evidentiary hearing. (Doc. 19). After Judge Kallon left the bench, and before the evidentiary hearing, the Clerk of Court randomly reassigned the case to the undersigned. (Doc. 25).

Via email communications with the Court and the United States, the attorney who the Court appointed to represent Mr. Gomez during the evidentiary hearing asked the Court to allow Mr. Gomez to participate in the evidentiary hearing via video conference to avoid travel to the Northern District of Alabama from FCI Beaumont Low in Texas. Because FCI Beaumont Low did not have the capacity to allow Mr. Gomez to participate from the prison via video conference, staff from the United States District Court for the Eastern District of Texas arranged for Mr. Gomez to travel there to participate in the evidentiary hearing via video conference. This Court thanks the staff at the Eastern District of Texas courthouse for their efforts.

# I.

To establish ineffective assistance of counsel, a defendant must prove "that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him." *Andrus v. Texas*, 590 U.S. 806, 813 (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  There is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  But "[a] lawyer who disregards specific instructions from the defendant to file notice of an appeal acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Rodriquez v United States*, 395 U.S. 327 (1969)).  The defendant is presumed to be prejudiced and is entitled "to an appeal without showing that his appeal would likely have had merit." *Peguero v. United States*, 526 U.S. 23, 28 (1999) (citing *Rodriquez*, 395 U.S. at 329–30).

When a defendant has not expressly instructed his attorney to file an appeal, his attorney may be ineffective for failing to adequately consult regarding an appeal. A district court "must [] inquire whether the attorney had the affirmative duty to consult." *Gomez-Diaz v. United States*, 433 F.3d 788, 792 (11th Cir. 2005) (citing *Flores-Ortega*, 528 U.S. at 478).  An attorney has a duty to consult "when there is reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that he was

interested in appealing." *Flores-Ortega*, 528 U.S. at 480.  If an attorney has a duty to consult, a district court "must inquire whether the attorney consulted with the client regarding the advantages and disadvantages of appealing and made a reasonable effort to determine the client's wishes." *Gomez-Diaz*, 433 F.3d at 792 (citing *Flores-Ortega*, 528 U.S. at 478).  To show prejudice, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's failure to consult with him about an appeal, he would have timely filed an appeal.  *Flores-Ortega*, 528 U.S. at 484.

## II.

On August 31, 2017, a grand jury indicted Mr. Gomez on one count of production of child pornography in violation of 18 U.S.C. § 2251(e)(2).  (Crim. Doc. 1).  Mr. Gomez pleaded not guilty, and, after several continuances, the Court set the case for trial on October 15, 2018.  (Crim. Doc. Sept. 14, 2015 minute entry; Crim. Docs. 13, 15, 17).  Mr. Glennon Threatt from the Federal Public Defender's Office represented Mr. Gomez through judgment.  (Doc. 39, p. 4; Crim. Doc. 6; Crim. Doc. 66, pp. 1, 5).[3]  According to Mr. Threatt, "from the day [he] met Mr. Gomez," Mr.

---

[3] Ebony Howard from the Federal Public Defender's office entered a notice of appearance for Mr. Gomez and was present at the plea hearing; Mr. Threatt represented Mr. Gomez at the plea and sentencing hearings.  (Crim. Doc. 7; Crim. Doc. 66, pp. 1, 5; Crim. Doc. 67, p. 1).  Mr. Threatt and Ms. Howard no longer work at the Federal Public Defender's office.  (Doc. 39, p. 4).

Gomez "wanted to go to trial." Mr. Threatt stated that Mr. Gomez maintained his innocence. (Doc. 39, pp. 10, 14).[4, 5]

On October 12, 2018, one business day before trial was to begin, Mr. Threatt notified the Court that Mr. Gomez intended to change his plea to guilty. (Doc. 37, p. 11; Crim. Doc. 40). Mr. Threatt notified the Court of Mr. Gomez's decision quickly because he wanted Mr. Gomez to receive acceptance of responsibility points in the offense level calculation in the presentence report that the United States Probation Office would have to prepare for a sentencing hearing. (Doc. 39, p. 6). The government apparently offered Mr. Gomez a plea agreement because Mr. Threatt testified that Mr. Gomez refused to sign "the plea agreement, because of the

---

[4] Mr. Threatt testified that, with the help of Eddie Fuentes, he met with Mr. Gomez at the Pickens County and Shelby County jails. (Doc. 39, pp. 4-5). Mr. Threatt stated that Mr. Fuentes worked with the public defender as an investigator and that Mr. Fuentes was fluent in Spanish. (Doc. 39, p. 5). Mr. Threatt testified that Mr. Gomez "spoke some English" and that Mr. Gomez sent him communications in English. (Doc. 39, p. 5). Mr. Threatt testified that he was not comfortable communicating with Mr. Gomez only in English, so he used a Spanish interpreter to communicate with Mr. Gomez. (Doc. 39, p. 5). Mr. Threatt stated in an affidavit that "Mr. Gomez did not speak English." (Doc. 14-2, p. 1). Mr. Gomez testified that before he pleaded guilty, he met with Mr. Threatt and the interpreter about four times at the Pickens County and Shelby County jails. (Doc. 39, pp. 21-22).

[5] Before responding to Mr. Gomez's § 2255 motion, the United States contacted Mr. Threatt and requested an affidavit concerning his work on behalf of Mr. Gomez. (Doc. 9, p. 1). Mr. Threatt asked for a ruling on whether Mr. Gomez waived attorney-client privilege on the matters raised in his § 2255 motion. Judge Kallon gave Mr. Gomez an opportunity to respond. (Docs. 9, 10). Mr. Gomez did not respond. (Doc. 11, pp. 1-2). Judge Kallon allowed the Federal Public Defender's office to disclose its confidential communications with Mr. Gomez concerning the appeal issue. (Doc. 11).

At the evidentiary hearing on his § 2255 motion, Mr. Gomez waived his attorney client privilege with Mr. Threatt for purposes of the hearing. (Doc. 39, p. 12)

waivers" in it.  (Doc. 37, p. 11).  The existence of a written plea agreement, or at least an effort to enter an agreement, also is reflected in Mr. Threatt's testimony that the United States indicated to him that it would recommend a sentence within the guideline range.  (Doc. 39, p. 13).  Recommendations like this appear in written plea agreements.  Mr. Gomez testified that he understood from Mr. Threatt that he would receive a 15-year sentence if he "signed this for him," but he would face a sentence of 15 to 30 years if he went to trial.  (Doc. 39, p. 22).[6]

On October 15, 2018, Mr. Gomez pleaded guilty to one count of production of child pornography.  (Crim. Doc. 66).  A Spanish interpreter participated in the hearing to assist Mr. Gomez.  (Crim. Doc. 66, p. 1).[7]  The parties did not provide a plea agreement at the hearing.  Judge Kallon advised Mr. Gomez that he was "proceeding on a blind plea," meaning that the government "had not agreed to make any recommendations to the Court as far as what your sentence should be."  (Crim. Doc. 66, pp. 11-12).  Because Mr. Gomez did not sign a written plea agreement, he

---

[6] In the declaration he submitted with his § 2255 motion, Mr. Gomez stated the Mr. Threatt told him that "if [he] took a plea offer[, he] would be sentenced to 180 months in prison," but if he went to trial, he "would be sentenced to a likely life term of imprisonment."  (Doc. 3).  Notably, Mr. Gomez's § 2255 motion and supporting memorandum of law are written in English.  (Docs. 1, 2).  Because English is not Mr. Gomez's primary language, the Court infers that someone helped Mr. Gomez prepare the motion, and some information in the motion may reflect inaccurate translation.

[7] In the plea hearing, Mr. Gomez stated that he read, wrote, and understood Spanish.  (Crim. Doc. 66, p. 3).  Mr. Gomez indicated that with the assistance of an interpreter, he discussed with Mr. Threatt and signed a Guilty Plea Advice of Rights form written in Spanish.  (Doc. 66, pp. 3-4; *see* Doc. 39).

did not waive his right to file an appeal or a post-judgment motion. (Crim. Doc. 66, pp. 11-12).

During the plea hearing, Judge Kallon discussed the potential penalties that Mr. Gomez faced if he pleaded guilty. (Crim. Doc. 66, p. 9). When Judge Kallon asked Mr. Threatt and the government's attorney if there were "enhanced penalties in this case," both replied, "No, Your Honor." (Crim. Doc. 66, pp. 8-9). Judge Kallon explained that Mr. Gomez faced a "prison term of at least 15 years and no more than 30 years," and Judge Kallon stated that he would have to sentence Mr. Gomez to "at least 15 years." (Crim. Doc. 66, p. 9). Mr. Gomez acknowledged that he understood the mandatory minimum sentence. (Crim. Doc. 66, p. 9). Based on Mr. Gomez's sworn answers during his change of plea hearing, Judge Kallon determined that Mr. Gomez was acting voluntarily, and Judge Kallon accepted Mr. Gomez's guilty plea. (Crim. Doc. 66, p. 16).

Following the change of plea hearing, the United States Probation Office met with Mr. Gomez and his attorney and an interpreter to prepare a presentence report. (Crim. Doc. 60, p. 12). Based on Mr. Gomez's offense level of 40 and criminal history category of I, the Probation Office calculated a guideline imprisonment range for him of 292 to 365 months, which converted to a range of 292 to 360 months based on the maximum sentence of 360 months. (Crim. Doc. 60, pp. 14-15). The final offense level of 40 consisted of a total offense level of 35, (Crim. Doc. 60, p.

8, ¶25), and a five-level Chapter Four enhancement pursuant to § 4B1.5(b), (Crim. Doc. 60, pp. 8-9, ¶26).[8]

Mr. Threatt filed written objections to the Chapter Four enhancement. Mr. Threatt stated that Mr. Gomez did not plead guilty to the conduct described in paragraphs 9 through 11 of the PSR, the conduct that supported the enhancement. (Crim. Doc. 46, p. 1, ¶¶ 1-3; *see* Crim. Doc. 60, p. 6, ¶ 9-11). Consequently, Mr. Gomez "dispute[d] that he engaged in 'a pattern of activity involving prohibited sexual conduct.'" (Crim. Doc. 46, pp. 1-2, ¶ 4). Mr. Threatt asserted that Mr. Gomez's guideline range without the enhancement was 168 to 210 months. (Crim. Doc. 46, p. 2, ¶ 5).[9] In his sentencing memorandum, Mr. Threatt asked the Court to sentence Mr. Gomez to 180 months of custody. (Crim. Doc. 56, p. 1). Mr. Threatt argued again that the Court should not apply the § 4B1.5(b) enhancement, and he

---

[8] Under the applicable guidelines, "prohibited sexual conduct" was any offense listed in 18 U.S.C. § 2426(b)(1)(A) or (B), the production of child pornography, or trafficking in child pornography if the defendant had a prior felony conviction for trafficking. USSG § 4B1.5 cmt. 4(A)(i)-(iii) (Nov. 2018). Section 2426(b)(1) included offenses listed in chapter 110 of Title 18, which included the production or attempted production of child pornography under 18 U.S.C. § 2251(a) and (e). 18 U.S.C. § 2426(b)(1). The guidelines defined a "pattern of activity" as two or more "occasion[s] of prohibited sexual conduct," regardless of "whether the occasion [] occurred during the course of the instant offense" or whether the occasion "resulted in a conviction from the conduct that occurred on that occasion." USSG § 4B1.5 cmt. 4(B)(i)-(ii) (Nov. 2018).

[9] The guideline range without the Chapter Four enhancement converted to 180 to 210 months based on the applicable 180-month mandatory minimum. (Doc. 56, pp. 2-3).

asserted that even if the Court applied the enhancement, the Court should vary downward to 180 months. (Crim. Doc. 56).

Judge Kallon held a sentencing hearing on April 16, 2019. (Crim. Doc. 67). At the hearing, M.P., the minor daughter of Mr. Gomez's girlfriend testified that for about four years, she, her mother, and her three sisters, one of whom was Mr. Gomez's biological daughter, lived with Mr. Gomez. (Crim. Doc. 67, pp. 6-7). M.P. stated that her mother found Mr. Gomez's cellphone in the bathroom the girls used; that her mother confronted Mr. Gomez; and that her mother told her to call the police. (Crim. Doc. 67, pp. 7-8). M.P. testified that about two months earlier, M.P. had found Mr. Gomez's phone in the bathroom pointed toward the shower. She stated that she stopped the videorecorder on the phone and put the phone in a drawer. (Crim. Doc. 67, pp. 9-10). M.P. told her mother about this incident. (Crim. Doc. 67, p. 30). M.P. indicated that one night, Mr. Gomez entered the locked bedroom that she shared with her sisters using a hidden key and "dip[ped] down" under her bed. When M.P. confronted Mr. Gomez, he stated that he was checking on M.P. and her sisters. (Crim. Doc. 67, p. 12). M.P. testified that Mr. Gomez sent her text message pictures of his genitalia when she was in seventh grade; after the second picture, M.P. blocked Mr. Gomez from her phone but did not report the pictures to

anyone. (Crim. Doc. 67, pp. 14-16, 25-26). M.P. testified that during arguments, Mr. Gomez physically assaulted her mother. (Crim. Doc. 67, p. 16).

Agent Scott Salser with the Alabama Law Enforcement Agency testified that he assisted with the case involving Mr. Gomez. (Crim. Doc. 67, p. 58). Agent Salser stated that on the night of Mr. Gomez's arrest, M.P. translated for her mother. M.P.'s mother stated that she discovered Mr. Gomez's phone in the bathroom she and her daughters shared with Mr. Gomez and that Mr. Gomez had recorded her daughters in the bathroom. (Crim. Doc. 67, p. 59). Agent Salser indicated that M.P.'s mother showed him a video she made to document Mr. Gomez's phone in the bathroom. (Crim. Doc. 67, pp. 59-60; *see* Doc. 58-5). Agent Salser stated that he mirandized Mr. Gomez and talked to him; Mr. Gomez consented to a search of his phone and gave Agent Salser the password to access the phone. (Crim. Doc. 67, p. 61). Agent Salser explained that M.P.'s mother showed him a video of child pornography that she had found in the "Google Cloud account trash bin" on Mr. Gomez's phone. (Crim. Doc. 67, pp. 62, 73-74).

FBI task force officer Jason McMinn, who was assigned to the Computer Analysis Response Team, testified that Mr. Gomez's cell phone contained a "video of a child using a bathroom" that was deleted from the phone on November 29, 2016, (Crim. Doc. 67, pp. 33, 37-38; *see* Crim. Doc. 58-1); child pornography screenshots from the video depicting images of A.P., a minor child with whom he was living,

created on or about November 14, 2016, (Crim. Doc. 67, pp. 38-40; *see* Crim. Doc. 58-2); and screenshots of A.P. in the bathroom taking off or putting on clothes, created on or about November 6, 2016, (Crim. Doc. 67, pp. 44-45; *see* Crim. Docs. 58-3, 58-4).[10]

Based on the evidence admitted during the sentencing hearing, Judge Kallon found that the government had shown by a preponderance of the evidence that the § 4B1.5 five-level enhancement applied, so Judge Kallon overruled Mr. Gomez's objection to the Chapter Four enhancement.  (Crim. Doc. 67, pp. 83-84).  Judge Kallon found a pattern of prohibited sexual conduct for purpose of the § 4B1.5 enhancement that included the "November 14th conduct" that was the basis for the indictment, the November 6 conduct involving the screenshots of A.P. in the bathroom, and the incident in which M.P. found Mr. Gomez's phone in the bathroom recording.  (Crim. Doc. 67, pp. 83-84).  Judge Kallon revised the PSR at sentencing to reflect that Mr. Gomez "dispute[d] the allegations and maintain[ed] he did not engage in the conduct involved in paragraphs 9, 10, [and] 11" of the PSR.  (Doc. 60, p. 6).  Judge Kallon found that Mr. Gomez's offense level was 40, his criminal history category was I, and his guideline range was 292 to 360 months.  (Crim. Doc. 67, p. 84).  Judge Kallon granted Mr. Threatt's motion for a downward variance and

---

[10]  At the sentencing hearing, Mr. Threatt argued that the November 6, 2016 screen shots of A.P. in the bathroom did not constitute child pornography.  (Doc. 67, p. 81).

sentenced Mr. Gomez to 240 months imprisonment to avoid sentencing disparities. (Crim. Doc. 67, pp. 88-89).

Before he concluded the sentencing hearing, Judge Kallon advised Mr. Gomez of his right to appeal. (Crim. Doc. 67, p. 93). Judge Kallon stated that "[w]ith very few exceptions," courts "strictly enforced" the 14-day time limit for appeals. (Crim. Doc. 67, p. 93). He continued: "So if you are going to appeal, you need to let your lawyer know right away so that you don't miss the deadline." (Crim. Doc. 67, p. 93). After explaining to Mr. Gomez that there was a fee for filing an appeal, Judge Kallon added: "The key thing to remember, again, sir, is that with very few exceptions, that 14-day deadline to appeal is strictly enforced." (Crim. Doc. 67, p. 93).

Mr. Threatt and Mr. Gomez spoke immediately after the April 16 sentencing hearing while Mr. Gomez still was at the courthouse. (Doc. 39, p. 22). Mr. Threatt testified that Mr. Gomez was "dissatisfied" and thought that his 240-month sentence "was too much." (Doc. 39, p. 13). Mr. Gomez testified that he asked Mr. Threatt what happened because Mr. Threatt had told him that "the offer was 15 years, and they gave me 20." (Doc. 39, p. 22). Mr. Threatt and Mr. Gomez remember their discussions regarding an appeal differently. At the evidentiary hearing on Mr. Gomez's § 2255 motion, Mr. Threatt stated that he spoke to Mr. Gomez about his appeal rights after the sentencing hearing and that Mr. Gomez did not ask him to

appeal.  (Doc. 39, pp. 7, 10-11).[11]  On direct examination, Mr. Threatt testified that Mr. Gomez asked whether he should appeal, and he (Mr. Threatt), with the help of an interpreter, responded that Mr. Gomez had a right to appeal, but "an appeal would be unsuccessful because of the waiver."  (Doc. 39, p. 7).  Later, during direct examination, Mr. Threatt stated that he did not tell Mr. Gomez that "an appeal was foreclosed by the terms of his plea agreement," but he explained to Mr. Gomez that his chances of success on appeal "were not likely."  (Doc. 39, p. 11).[12]  Mr. Threatt indicated that Mr. Gomez asked whether he could receive a "greater sentence if he appealed," and Mr. Threatt told him that he could receive "a guidelines or the statutory maximum."  (Doc. 39, p. 7).  Mr. Threatt testified that Mr. Gomez "said if that [was] true, then [he did not] want to appeal."  (Doc. 39, p. 7).

Mr. Gomez testified that he told Mr. Threatt that he "needed him to put in an appeal."  (Doc. 39, p. 23).  According to Mr. Gomez, Mr. Threatt told him that he was going to appeal.  (Doc. 39, pp. 22-23).[13]  Mr. Gomez stated that Mr. Threatt indicated that his "part [was] over with this case" but that "[s]omebody else [was]

---

[11] Separately, Mr. Threatt asserted in his affidavit that Mr. Gomez did not "inform [him] that he wanted to appeal his sentence."  (Doc. 14-1; Doc. 14-2, p. 2).

[12] When the Court questioned Mr. Threatt about his testimony about a waiver, Mr. Threatt said he misspoke because Mr. Gomez did not sign a plea agreement and "would not be subject to an appeal waiver."  (Doc. 39, p. 31).

[13] In his declaration, Mr. Gomez stated that he told Mr. Threatt he wanted to appeal, but Mr. Threatt told him that "an appeal was foreclosed by the terms of [his] plea agreement," and Mr. Threatt "refused to pursue any level of appeal."  (Doc. 5).

going to intervene." (Doc. 39, p. 23).[14] Deputy marshals interrupted the conversation to return Mr. Gomez to the Shelby County Jail. (Doc. 39, p. 23). Mr. Gomez did not see Mr. Threatt again, and he did not receive mail from Mr. Threatt. (Doc. 39, pp. 23-25).[15] Mr. Gomez stated that he attempted one time to contact Mr. Threatt by telephone, but "they did not reply to [him]." (Doc. 39, pp. 24-25).

The Court entered the written judgment in Mr. Gomez's criminal case on April 19, 2019. (Crim. Doc. 62, p. 1). Mr. Threatt testified that after the sentencing hearing, pursuant to the "regular practice of [his] office," he signed a "judgment letter" on April 22, 2019 that was mailed to Mr. Gomez at the Jefferson County jail. (Doc. 39, pp. 8-9). The judgment letter, which is written only in English, enclosed a copy of Mr. Gomez's judgment, notified Mr. Gomez of his right to appeal, indicated that Mr. Threatt did not "believe that any grounds to support an appeal existed," and advised Mr. Gomez to contact him if he "wish[ed] to appeal the judgment." (Doc. 38-1). Mr. Threatt testified that he took a defendant's right to appeal very seriously because missing an appeal deadline could "be fatal to the client for his Constitutional right." (Doc. 39, p. 9). Julia Kimbrough, the chief paralegal

---

[14] Mr. Threatt stated that if Mr. Gomez had indicated that he wanted to appeal, the "standard protocol" would have been for Mr. Threatt to "immediately sen[d] an email to the [F]ederal [P]ublic [D]efender, Kevin Butler, and also to Toby Smith, who was head of the appellate division at the time, and they would take it at that point forward." (Doc. 39, p. 7).

[15] Mr. Gomez stated that when he left the courthouse after sentencing, he went to the Shelby County jail for about six days, to the Jefferson County jail "until at least April 25," to the Clay County jail for about a week, and then to Atlanta for about three days. (Doc. 39, p. 24).

with the Federal Public Defender's Office, testified that she prepared Mr. Gomez's judgment letter for Mr. Threatt, mailed it to Mr. Gomez the day Mr. Threatt signed the letter, and put a copy of the letter in Mr. Gomez's file. (Doc. 39, pp. 16-18). Because Ms. Kimbrough did not send the letter via certified mail with a return receipt, neither she nor Mr. Threatt knows whether Mr. Gomez received the letter; the postal service did not return the letter to the Federal Public Defender's Office. (Doc. 39, pp. 14, 18, 20).[16]

Because Mr. Gomez did not appeal his conviction or sentence, his conviction became final on May 3, 2019, fourteen days after Judge Kallon entered judgment against him. *Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011) ("[W]hen a defendant does not appeal his conviction or sentence, the judgment of conviction becomes final when the time for seeking that review expires."); Fed. R. App. P. 4(b)(1) (establishing a 14-day deadline for appeals by criminal defendants); (*see* Crim. Doc. 62).

## III.

Mr. Gomez and Mr. Threatt offer very different accounts of their conversation regarding an appeal of Mr. Gomez's conviction and sentence; Mr. Gomez says he

---

[16] Mr. Threatt testified that if the postal service returned a judgment letter, the "standard practice" in his office was that the lawyer had to "call the marshal service, locate [the defendant], and then go to the jail personally and give [the defendant] the judgment letter." (Doc. 39, p. 9). Because the letter to Mr. Gomez was not returned to the Federal Public Defender's Office, Mr. Threatt did not follow this standard practice. (Doc. 39, pp. 9-10).

instructed Mr. Threatt to appeal, and Mr. Threatt says Mr. Gomez did not instruct him to appeal. On the record here, the Court may not need to choose a side because, as noted, in *Gomez-Diaz*, the Eleventh Circuit held that "even if a client has not made a specific request of his attorney to file an appeal," to determine whether an attorney provided effective assistance, "a court must inquire whether the attorney consulted with the client regarding the advantages and disadvantages of appealing and made a reasonable effort to determine the client's wishes." 443 F.3d at 792. A court's obligation to examine the scope of consultation issue is not optional; it is mandatory. *Gomez-Diaz v. United States*, 433 F.3d at 792.[17]

In *Flores-Ortega*, the Supreme Court spoke at length about the scope of a criminal defense attorney's duty to consult with his client regarding an appeal. The Supreme Court explained:

> We employ the term "consult" to convey a specific meaning -- advising the defendant about the advantages and disadvantages of taking an

_____

[17] In *Gomez-Diaz*, the defendant, in his *pro se* § 2255 motion and accompanying memorandum, "claim[ed] that he was denied his Sixth Amendment right to the effective assistance of counsel because his lawyer, though asked to appeal, failed to perfect an appeal." 433 F.3d at 790. The only question presented to the Court of Appeals in a certificate of appealability was this: "Whether appellant was denied effective assistance of counsel when counsel failed to file a timely notice of appeal after appellant allegedly requested counsel to do so." 433 F.3d at 790. Regarding the scope of the issue before it, the Eleventh Circuit explained that the specific allegation in the defendant's § 2255 motion "need not detain us long because we are construing the pleadings of a pro se petitioner, and we must construe them liberally." 433 F.3d at 791 (citing *Tannenbaum v. United States,* 148 F.3d 1262, 1263 (11th Cir. 1998)). On appeal, the defendant argued that he had asked his attorney to file an appeal, and his attorney replied that "an appeal was not his best option, recommending a § 2255 motion instead." 433 F.3d at 791. On appeal, the defendant argued that the district court should have determined whether evidence demonstrated that he specifically instructed his attorney to file an appeal, and, if there was not sufficient evidence of an explicit instruction, the district court should have determined "whether his lawyer failed to fulfill the

appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. *See supra,* at 1034 and this page. If counsel has not consulted with the defendant, the court must in turn ask a second, and subsidiary, question: whether counsel's failure to consult with the defendant itself constitutes deficient performance. That question lies at the heart of this case: Under what circumstances does counsel have an obligation to consult with the defendant about an appeal?

Because the decision to appeal rests with the defendant, we agree with Justice SOUTER that the better practice is for counsel routinely to consult with the defendant regarding the possibility of an appeal. . . . [W]e have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices. We cannot say, as a *constitutional* matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable, and therefore deficient. Such a holding would be inconsistent with both our decision in *Strickland* and common sense. *See id.,* at 689, 104 S. Ct. 2052 (rejecting mechanistic rules governing what counsel must do). For example, suppose that a defendant consults with counsel; counsel advises the defendant that a guilty plea probably will lead to a 2 year sentence; the defendant expresses satisfaction and pleads guilty; the court sentences the defendant to 2 years' imprisonment as expected and informs the defendant of his appeal rights; the defendant does not express any interest in appealing, and counsel concludes that there are no nonfrivolous grounds for appeal. Under these circumstances, it would be difficult to say that counsel is

---

constitutionally imposed duty to consult with him about appeal," and whether he could show "a reasonable probability that, but for the lawyer's deficient consultation, he would have timely appealed." 433 F.3d at 791. The Court of Appeals agreed that the defendant's *pro se* petition encompassed both issues, and the Court of Appeals remanded the case for the district court to hold an evidentiary hearing on both, stating that the district court must consider whether the defendant's attorney "fulfilled his constitutional duty to consult with his client and to make a reasonable effort to determine [his client's] wishes, and whether he acted in accordance with those wishes." 433 F.3d at 792-93. Here, as in *Gomez-Diaz*, Mr. Gomez did not have the help of an attorney when he filed his § 2255 motion. (Doc. 1).

"professionally unreasonable," *id.,* at 691, 104 S. Ct. 2052, as a constitutional matter, in not consulting with such a defendant regarding an appeal. Or, for example, suppose a sentencing court's instructions to a defendant about his appeal rights in a particular case are so clear and informative as to substitute for counsel's duty to consult. In some cases, counsel might then reasonably decide that he need not repeat that information. We therefore reject a bright-line rule that counsel must always consult with the defendant regarding an appeal.

We instead hold that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. See *id.,* at 690, 104 S. Ct. 2052 (focusing on the totality of the circumstances). Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Flores-Ortega*, 528 U.S. at 478-80 (italics in *Flores-Ortega*).

The evidence in this case demonstrates overwhelmingly that a rational defendant would want to appeal in this case and that Mr. Gomez "was interested in appealing." Similarly, the record demonstrates that Mr. Threatt did not fulfill his duty to consult with Mr. Gomez about the advantages and disadvantages of an appeal

and that there is a reasonable probability that, but for counsel's failure to consult properly with Mr. Gomez about an appeal, Mr. Gomez would have timely filed an appeal. *Flores-Ortega*, 528 U.S. at 480. With respect to Mr. Gomez's interest in an appeal and a rational defendant's interest in an appeal, Mr. Threatt testified that from the start, Mr. Gomez maintained his innocence and wanted to go to trial. Mr. Threatt stated that when Mr. Gomez decided on the eve of trial to plead guilty, Mr. Gomez refused a plea agreement because the proposed agreement contained an appeal waiver. (Doc. 39, p. 11). At the change of plea hearing, as discussed, no one anticipated that Mr. Gomez would face an enhanced penalty at sentencing, (Crim. Doc. 66, pp. 8-9), and Mr. Gomez anticipated a sentence of no more than 180 months, (Doc. 39, p. 22).[18] Mr. Threatt stated that when he spoke to Mr. Gomez after the sentencing hearing, Mr. Gomez was "dissatisfied" because he thought the 240-month sentence "was too much." (Doc. 39, p. 13). Evidence of Mr. Gomez's

---

[18] Mr. Gomez maintained in his declaration in support of his § 2255 motion and in his hearing testimony that Mr. Threatt told him that he would receive a sentence of 15 years of imprisonment if he pleaded guilty and that, when the Court sentenced him to 20 years, he asked Mr. Threatt to file an appeal. There is no evidence that Mr. Gomez knew before he pleaded guilty that a five-level chapter four enhancement could apply to increase his guideline range from 180 to 210 months to 292 to 360 months. The enhancement would make a 180-month sentence unlikely. Mr. Threatt testified that before Mr. Gomez pleaded guilty, he discussed with Mr. Gomez an estimated guideline range, but Mr. Threatt did not identify the specific guideline range he discussed with Mr. Gomez. The guideline range in Mr. Gomez's PSR prompted written and oral objections from Mr. Threatt, preserving for appeal a challenge to the enhanced guideline range. Judge Kallon's variance to a 240-month sentence does not preclude the challenge because the guideline range without the enhancement was 30 to 60 months below the imposed sentence. The evidence supports an inference that Mr. Gomez wanted to challenge his guilty plea, the guideline range, and the sentence that exceeded by 60 months the sentence he understood he was facing when he pleaded guilty. A rational defendant would want to appeal under these circumstances.

professed innocence, rejection of a plea agreement containing an appeal waiver, and surprise by and dissatisfaction with the sentence imposed aligns with Mr. Gomez's professed interest in an appeal and with his contention that he asked Mr. Threatt to file an appeal. A rational defendant would want to pursue an appeal under these circumstances. *See Palacios v. United States*, 453 Fed. Appx. 887, 889 (11th Cir. 2011) (stating that a defendant's expression of dissatisfaction with his sentence coupled with questions about whether he should appeal triggers an attorney's duty to consult).

With respect to consultation about the advantages and disadvantages of an appeal, the evidence indicates that the conversation between Mr. Threatt and Mr. Gomez following the sentencing hearing was brief and silent as to the advantages of an appeal. Mr. Threatt testified that he spoke to Mr. Gomez about his appeal rights at the courthouse immediately after the sentencing hearing. (Doc. 39, pp. 6-7, 22-23). Mr. Gomez indicated that his conversation with Mr. Threatt was hurried because a deputy marshal interrupted the conversation to transport him to the Shelby County jail. (Doc. 39, p. 23).[19]

Mr. Threatt initially testified that during his visit with Mr. Gomez at the courthouse after the sentencing hearing, he told Mr. Gomez that he had a right to

---

[19] The amount of time Mr. Threatt spent with Mr. Gomez after the sentencing hearing is a factor the Court may consider in its analysis of the adequacy of consultation. *See Thompson v. United States*, 504 F.3d 1203, 1207 n.7 (11th Cir. 2007) (finding that, on a record that demonstrated that defense counsel spoke with the defendant for no more than five minutes in the courtroom after his

appeal, but "an appeal would be unsuccessful because of the [appeal] waiver." (Doc. 39, p. 7). Not long afterwards, Mr. Threatt retracted his statement concerning an appeal waiver but stated that he told Mr. Gomez that "the chances of him winning on appeal were not likely," and when Mr. Gomez asked whether he could receive a greater sentence if he appealed, Mr. Threatt told him that he could receive a guideline sentence or the statutory maximum of 30 years. (Doc. 39, pp. 7, 11).[20] In short, Mr.

_____

sentencing hearing ended, "[w]hile not dispositive, the short duration of the exchange" was relevant and "weigh[ed] against finding adequate consultation as a matter of law); *see Flores–Ortega,* 528 U.S. at 489 (Souter, J., concurring in part and dissenting in part) ('If the crime is minor, the issues simple, and the defendant sophisticated, a 5–minute conversation with his lawyer may well suffice; if the charge is serious, the potential claims subtle, and a defendant uneducated, hours of counseling may be in order.').""). The current record does not reflect the precise length of Mr. Threatt's visit with Mr. Gomez after the sentencing hearing.

[20] Though Mr. Threatt retracted his comment tethering Mr. Gomez's chances of success on appeal to a written plea agreement, when Mr. Gomez filed his § 2255 motion, he submitted with it a declaration in which he stated that Mr. Threatt told him that "an appeal was foreclosed by the terms of [his] plea agreement." (Doc. 3). Given Mr. Threatt's confusion about an appeal waiver at the § 2255 evidentiary hearing, the Court considers the possibility that Mr. Threatt may have mistakenly stated to Mr. Gomez during their brief post-sentencing conversation that an appeal was foreclosed by a settlement agreement.

After his conversation with Mr. Gomez at the courthouse in which he advised Mr. Gomez that his chances of success on appeal were slim, Mr. Threatt again discouraged Mr. Gomez from filing a notice of appeal in the letter that he sent to Mr. Gomez on April 22, 2019 after the Court entered judgment on April 19, 2022. With the appeal clock running, Mr. Threatt reiterated that he did not believe Mr. Gomez had "any meritorious grounds to support an appeal." (Doc. 38-1). As noted, deputy marshals took Mr. Gomez to the Shelby County jail after his April 16 sentencing hearing. Mr. Gomez testified that he stayed at the Shelby County jail for approximately six days and then moved to the Jefferson County jail "until at least April 25." (Doc. 39, p. 24). From there, Mr. Gomez transferred to the Clay County jail for about a week and then to Atlanta for about three days. (Doc. 39, p. 24). The Federal Public Defender's Office addressed the April 22 judgment letter to Mr. Gomez at the Jefferson County jail. The letter, dated three days after entry of judgment, may not have reached Mr. Gomez in time for him to contact Mr. Threatt to request an appeal within the 14-day appeal window. There is no evidence that Mr. Gomez received the letter. The letter is relevant because it is consistent with the evidence that Mr. Threatt's advice to Mr. Gomez regarding appeal addressed only the disadvantages of an appeal.

Threatt communicated to Mr. Gomez that he would not succeed on appeal and that he could receive a longer sentence if he was successful on appeal.  There is no evidence that Mr. Threatt advised Mr. Gomez about the potential advantages of an appeal. *See Thompson*, 504 F.3d at 1207 ("Simply asserting the view that an appeal would not be successful does not constitute 'consultation' in any meaningful sense. No information was provided to Thompson from which he could have intelligently and knowingly either asserted *or* waived his right to an appeal.").

Mr. Threatt testified that Mr. Gomez did not want to appeal because if he were successful, on remand, the judge might impose the maximum sentence of 30 years. But if Mr. Gomez had succeeded on appeal, his guideline range would have been 180 to 210 months, making a 30-year sentence unlikely.  Given Judge Kallon's decision to vary downward at the sentencing hearing, it is extremely unlikely that he would have imposed the statutory maximum if he had had to resentence Mr. Gomez. Such an upward variance would carry with it an argument that the Court was impermissibly punishing Mr. Gomez for appealing his sentence and would provide grounds for another appeal.  *Alabama v. Smith*, 490 U.S. 794, 799–800 (1989) ("While sentencing discretion permits consideration of a wide range of information

---

The letter Mr. Threatt sent to Mr. Gomez after the sentencing hearing is inconsistent with Mr. Gomez's testimony that he instructed Mr. Threatt to appeal.  Mr. Threatt would not have sent the letter had he understood that Mr. Gomez instructed him to appeal.  Instead, he would have had the appellate attorney in his office file a notice of appeal. (Doc. 39, p. 7).  The Court has no basis to find that Mr. Threatt intentionally disregarded Mr. Gomez's instruction to file an appeal and sent a judgment letter to cover his tracks.

relevant to the assessment of punishment . . . , [sentencing discretion] must not be exercised with the purpose of punishing a successful appeal. . . . Due process of law [] requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial.") (internal citations omitted). To be sure, a higher sentence after an appeal is possible, but on the record here, the possibility was very slim and should not have precluded an appeal. There is no evidence that this information was conveyed to Mr. Gomez. A sentence within a lower guideline range would benefit Mr. Gomez significantly, making an appeal attractive even if the chances of success were small. Mr. Gomez had nothing to lose by appealing his sentence. On this record, Mr. Gomez's testimony that he wanted to appeal is credible, and Mr. Threatt's failure to advise Mr. Gomez about the minimal risks associated with an appeal is probative of the effectiveness of his consultation with Mr. Gomez.

Also probative of the effectiveness of consultation is the evidence that Mr. Threatt spoke with Mr. Gomez through an interpreter at the courthouse after the sentencing hearing and did not speak with him again. Mr. Threatt, knowing that Mr. Gomez has a language barrier and had not previously faced a significant jail sentence, sent a letter written in only English. Mr. Gomez had to rely on family

members or prisoners to interpret the letter and communicate his wish to appeal.[21] Under the circumstances of this case, that is not reasonable.

The Court finds persuasive the decision in *Hanlon v. United States*, 2016 WL 7049241 (M.D. Fla. Dec. 5, 2016).  Like Mr. Hanlon, Mr. Gomez "was not a court-savvy client who had been through the federal system before," so "[w]hile it was certainly proper to give petitioner time to think about [an appeal] before making a decision, it was counsel's obligation to follow up on the decision in order to comply with his duty to 'mak[e] a reasonable effort to discover the defendant's wishes,'" especially when the petitioner was a client with a language barrier who was in custody.  *Hanlon*, 2016 WL 7049241 at *3.  It was not reasonable to place the burden of communication on Mr. Gomez under the circumstances of this case, especially where, as here, it appears counsel's effort was tempered by his belief that Mr. Gomez did not have a strong ground for appeal.  The potential merits of a defendant's appeal may not truncate an attorney's effort to determine his client's wishes concerning

---

[21]  In another case before this Court in which the FPD represented a defendant who primarily spoke Spanish, the FPD sent the defendant a letter regarding appeal rights written in both English and Spanish.  *See Jaramillo-Echeverria v. United States*, 2:16-cv-08110, (Doc. 28-1).  The Court takes judicial notice of the filing in *Jaramillo-Echeverria* as a public record because the filing is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (quoting Fed. R. Evid. 201(b)(2)); *see Universal Express, Inc. v. U.S. SEC*, 177 Fed. Appx. 52, 53 (11th Cir. 2006) (holding that judicial notice of public records, like court filings, is proper).

appeal.  If a criminal defense attorney sincerely believes that an appeal has no merit, then he may file an *Anders* brief.

The record indicates that counsel's failure to fulfill his obligation to consult with Mr. Gomez prejudiced Mr. Gomez because the record shows a "reasonable probability that [Mr. Gomez] would have appealed without regard to the putative merits of such an appeal" had he been consulted about the advantages and disadvantages of an appeal.  *Thompson*, 504 F.3d at 1208.  Had Mr. Threatt explained that it was very unlikely that Mr. Gomez would receive a higher sentence if he appealed, a reasonable probability exists that Mr. Gomez would have filed an appeal.  "[I]t cannot be said that no rational defendant would have wanted to appeal the [240-month] sentence imposed under the facts of this case," given that Mr. Gomez likely had little to lose and entered a blind plea so that he would have the option of appealing his sentence.  *Thompson*, 504 F.3d at 1208.

As discussed, the Court must construe Mr. Gomez's § 2255 motion to include a claim for ineffective assistance of counsel for failure to adequately consult regarding the advantages and disadvantages of filing an appeal.  Neither party has briefed this issue or presented evidence concerning it.  Any party who wishes to supplement its submissions to date may submit a brief and additional evidence by March 27, 2025.

**DONE** and **ORDERED** this March 6, 2025.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE